No. 45,811

WILLIAM O. LINVILLE, *Appellee*, v. STEEL FIXTURE MANUFACTURING COMPANY and CIMARRON INSURANCE COMPANY, *Appellants*.

(469 P. 2d 312)

Opinion filed May 9, 1970.

*Ralph E. Skoog,* of Dickinson, Crow and Skoog, of Topeka, argued the cause and was on the brief for the appellants.

*E. J. Schumacher,* of Topeka, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal in a workmen's compensation case challenging an award of compensation to the claimant by reason of an occupational disease which involves the application of K. S. A. 44-5a04.

The claimant, William O. Linville, commenced employment with the respondent, Steel Fixture Manufacturing Company, on September 15, 1967. He was employed as a general laborer with

duties in the assembly of cases manufactured by the plant, and in helping to crate completed assemblies for shipment. During his employment from September to December, 1967, a part of his responsibility, together with other employees, was to provide a "brushed" finish on stainless steel tubing and bronze tubing used for rollers in the front of roller shelving assemblies. This required the use of a sanding machine on the stainless steel tubing and the bronze tubing.

During the latter part of November the claimant developed redness on his hands and forearms, which gradually intensified into a rash and then developed into some small sores which became secondarily infected. As a result he was sent to Dr. Hubert L. Harris, a dermatologist in Topeka, Kansas, for treatment.

Dr. Harris diagnosed the difficulties which claimant was experiencing as contact dermatitis, and took him off work treating him for the contact allergy. The cause was attributed to the dust created by the sanding of stainless steel which had a high content of nickel.

The respondent paid total temporary compensation at the rate of $49 per week after December 19, 1967, when the claimant was first disabled by reason of the allergy, to the time of his re-employment on March 25, 1968.

Thereafter the claimant was able to carry on his work as a general laborer in the factory at the same wage upon the agreement of the claimant, the respondent and his treating physician. When the claimant was re-employed his contact dermatitis was controlled, but not cured. His hands and forearms were pink and tender but steadily improving. To avoid aggravating the claimant's allergy he was no longer permitted to work at the sanding machine with stainless steel or bronze tubing, in accordance with the treating physician's recommendation.

The claimant remained at his work until the 29th day of April, 1968, when he became ill with what appeared to be a bad cold. At this time the claimant's hands were steadily improving and there was no recurrence of rash or blisters evidencing contact dermatitis. Dr. Harris during May, 1968, considered the claimant's condition to be controlled but not well, and was about to release the claimant from therapy when he had a flare-up of the contact dermatitis. This flare-up occurred on or about May 31, 1968.

Dr. Harris testified that once before, during the claimant's first absence from employment while he was treating him, he was about

to release the claimant for work but the claimant experienced a flare-up of the contact dermatitis.

On June 3, 1968, Dr. Harris saw the claimant for the dermatitis condition which flared up on Memorial Day and treated him.

The claimant has not returned to work since that time. Dr. Harris kept him off work and treated him regularly until the 1st day of August, 1968. At that time his condition was described by Dr. Harris to be pretty good but he was not completely well, and he was not totally off medicine.

Dr. Harris testified:

"It has not been my experience that the body seems to break down after this contact dermatitis. I would not expect him to have any permanent effects from this at all but many things that would not have irritated it before you have this allergic dermatitis begin to irritate you. I think once a man has been through contact dermatitis then I don't think that his kind of employment should be one that exposes him to strong chemicals. In other words, I wouldn't like for him to go and be a painter or go out to Goodyear and work with rubber. He could, of course, be a truck driver or things like that.

$\cdot\quad\cdot\quad\cdot\quad\cdot\quad\cdot\quad\cdot\quad\cdot\quad\cdot\quad\cdot\quad\cdot\quad\cdot\quad\cdot$

"I think his prognosis is real good. When I saw Mr. Linville on the 21st of May he was in pretty fair shape, making an excellent recovery, and was still good. After that he had a major flare-up, before June 3rd, on May 31st in fact. I had seen him on April 23, April 30 and May 7, before May 21 and he was doing well. Fortunately, he has gotten by without any major complications.

"He looks like he is going to get a total recovery. I foresee this man being able to get back and doing full time work in the near future but you don't like to put them out too soon, you see. I wouldn't want him working with something that is a particularly active chemical. I would say that I can turn him loose in the next month or two from this first day of August, 1968, that's just a guess. I don't know anything about his lungs. One time he had a bad cold and I think I told him to see his private doctors for that.

"Q. And you would think that permanently he has an industrial disability rating?

"A. I would say that once he's well of this, he should be well."

At the hearing before the examiner on July 9, 1969, it was stipulated between the parties that the claimant was released by Dr. Harris from treatment for his dermatitis of the hands on December 6, 1968, three days before the original award was entered by the examiner. It was further *stipulated* that at the time of claimant's release on December 6, 1968, *the treating physician did not rate the claimant as having permanent partial disability as a result of the contact dermatitis of his hands.*

On May 21, 1968, the claimant saw Dr. Andre Baude, a medical doctor and specialist in internal medicine and chest in Topeka, for

his lung condition. He related the history of his contact dermatitis to Dr. Baude and the treatment by Dr. Harris. The claimant denied all illnesses but complained that for the past few weeks he had been somewhat short of breath and coughed. As a result of Dr. Baude's examination on May 21, 1968, he diagnosed the claimant as having tuberculosis, emphysema and fibrosis. He recommended that the claimant be transferred to the chest clinic for treatment starting the next week. His diagnosis was that the tuberculosis was probably active. A chest X-ray was taken and showed tuberculosis moderately advanced and probably active.

The claimant was seen shortly before the 1st day of August, 1968, complaining of shortness of breath. The tuberculosis test received was positive. Dr. Baude said:

". . . He should not work and did quit smoking. In regard to his availability to labor I believe this patient is totally disabled and will be for some time. I can not tell for how long it may be.

. . . . . . . . . . . . . .

"It is my judgment that last September, 1967, when this man commenced to work that he was at that time suffering from some substantial lung problems. I would think that the difficulty with lungs, which I've identified as tuberculosis, existed as long ago as last September. The emphysema which I have described is visible on the xrays and appears very differently from the tuberculosis. The emphysema results from the fact that the lung has no elasticity and is not able to empty. The fibrosis is scar tissue and it would be mixed with the hardening and lack of elasticity.

. . . . . . . . . . . . . .

"I would not associate the tuberculosis itself with his employment. It could make it worse but the tuberculosis, I would think, is a result of a long term difficulty.

. . . . . . . . . . . . . .

"Mr. Linville never had a well lung system during his employment.

"I have no idea that there is any connection between the contact dermatitis that this man had and the problem that he has in his thoracic cavity. There's no connection as far as I know."

## On December 9, 1968, the examiner found:

"It is found that the claimant has suffered under K. S.A. 44-5a01 and 44-5a02 a compensable occupational disease by reason of dermatitis, arising out of and in the course of his employment from and after December 18, 1967, until March 25, 1968, a period of 13.57 weeks for which he is entitled to temporary total disability. For the period of March 25, 1968, until April 29, 1968, the claimant had returned to work and was working full time. From April 29, 1968, until June 3rd, 1968, the claimant was off work for causes other than his dermatitis, but during this period of time he remained in the care and under the treatment of Dr. Harris for the dermatitis condition which was improving up until the latter part of May, when he suffered a flare-up of

the dermatitis condition on his hands and was again placed under more intensive treatment by Dr. Harris. During the period December 18, 1967, to August 1, 1968, the claimant remained under the treatment for his dermatitis with Dr. Harris. From June 3, 1968, to August 1, 1968, the claimant has suffered another period of temporary total disability, a period of 8.29 weeks and that thereafter the claimant has suffered and continues to suffer 50% general bodily disability by reason of disablement for a compensable occupational disease from his capacity to perform his work in the last occupation in which he was exposed to the hazards of such disease. . . . *While it is probably true in this case that the claimant, were it not for other physical disabling factors, could have returned to other work and would remain in other work at the present time irregardless of his dermatitis, the fact remains that the claimant is not able to work at the present time and therefore claimant's capacity to earn the same or higher wages than he did at the time of his disablement, by whomever employed from any trade or employment, is not relatable to the amount of compensation due in this matter because the claimant is not employable because of other causes.* The fact still remains that the claimant is 50% disabled from his last occupation, in which he was injuriously exposed to the hazards of his occupational disease and the fact that he is not able to pursue other types of employment in which he would not be exposed to the conditions which brought on the occurrence of his occupational disease, cannot be used to deny him compensation at this time.

"It is further found that the respondent should pay the medical expenses incurred by the claimant for the treatment of his occupational disease of dermatitis, consisting of the bill of Dr. Harris and all pharmaceutical bills relating to prescriptions provided by Dr. Harris for the treatment of his dermatitis. The respondent should pay all future medical and hospital expenses related to his dermatitis until such time as he is released by Dr. Harris from treatment for dermatitis.

"It is further found that the claimant is suffering from tuberculosis and emphysema. Tuberculosis is a communicable disease and as such is not compensable under the Workmen's Compensation Act, either as an occupational disease or as a personal injury by accident. Emphysema is not listed as a compensable occupational disease. It is found that the claimant has not borne the burden of proving that his emphysema was caused by personal injury by accident arising out of and in the course of his employment. Therefore compensation and medical expenses involved in the treatment of any and all lung conditions suffered by the claimant involving tuberculosis, fibrosis and emphysema are hereby denied."

Accordingly, an award was entered for total temporary disability from December 18, 1967, until March 25, 1968, and from June 3, 1968, until August 1, 1968; for 50% permanent partial disability until the further order of the director, for a period not to exceed 415 weeks from the date of the accident; and for medical expenses and the cost of the deposition of Dr. Harris.

Upon review by the director on the 29th day of June, 1969, the

director found the award of the examiner to be in accord with the laws of Kansas and affirmed the examiner's award. On appeal the district court on the 23rd day of April, 1969, adopted the findings and award of the examiner, the order approving the same by the director of workmen's compensation and entered judgment awarding compensation by adopting the findings and award of the director.

Appeal has been duly perfected by the respondent and its insurance carrier, and a cross appeal was taken by the claimant.

On the 10th day of December, 1969, the claimant's cross appeal was dismissed under Rule No. 8 (c) of the Supreme Court (203 Kan. xxix) for failure of the claimant (appellee) to file a brief as required by the court.

On April 6, 1970, one day prior to the argument of this case on appeal in the Supreme Court, the claimant filed a belated brief consisting of two typewritten pages. The case was argued on April 7, 1970, and on the 10th day of April, 1970, the claimant filed with the clerk a motion to reinstate his cross appeal, a motion to add and designate additional material to the record, and a brief in support of his motion to reinstate the cross appeal.

The claimant's untimely motions to reinstate the cross appeal and add additional material to the record are denied.

The issue here presented is one of first impression. The examiner, the director and the trial court all relied upon two recent cases decided by this court: *Knight v. Hudiburg-Smith Chevrolet, Olds., Inc.,* 200 Kan. 205, 435 P. 2d 3; and *Ochoa v. Swift & Co.,* 200 Kan. 478, 436 P. 2d 412. It was the opinion of the examiner and the director that the *Knight* case had changed the workmen's compensation law in its application to occupational diseases.

The applicable sections of the workmen's compensation act relative to disablement or death of an employee or workman resulting from an occupational disease were quoted and carefully analyzed in the *Knight* case. Without again reviewing these sections as undertaken therein, it will be assumed the reader has familiarized himself with these statutory sections. In *Knight* the workman who was disabled by reason of an occupational disease earned an average weekly wage of $92.09 for approximately 49 hours of work per week before the injury, and was able to earn and had earned after the injury the sum of $85.60 per week on an average of 49 hours per week. Compensation was allowed on the basis of the

difference in his weekly earning capacity, and this was affirmed on appeal. In the opinion the court said:

"It would be unwise here to attempt to postulate general rules applicable to all categories of occupational disease cases and we undertake no such endeavor. However, as applied to the facts in the case at bar, and keeping in mind our workmen's compensation statutes are to be construed as a single comprehensive act, we think the foregoing stautory recitation evinces certain legislative intent: Partial disability from occupational disease is compensable; such compensation is payable as provided in the existing workmen's compensation act except as otherwise provided in the occupational disease aspect of the act; the term 'disability' when attributable to occupational disease is separately defined and it means the state of a workman being actually incapacitated, partially or totally, because of an occupational disease, from performing his work in the last occupation in which he was injuriously exposed to the hazards of such disease; and finally, the capacity of the workman to earn the same or higher wages than he did at the time of the disablement, by whomever employed, *from any trade or employment*, is relatable to the amount of compensation due, to the extent that the award therefor may be cancelled and the compensation ended.

"If the capacity of the workman to earn the same or higher wages than he did at the time of the disablement, from any trade or employment, is relatable to the amount of compensation due, so that the award may be cancelled, then it logically follows that his capacity to earn wages from any trade or employment is relatable to the amount of compensation due, to the extent the award may be diminished accordingly. We believe K. S. A. 44-510 (3) (c) (24), as herein construed in connection with other provisions of Chapter 44, Article 5a, provides a practicable and a fair method for such computation." (p. 209.)

A similar case was before the court in *Ochoa v. Swift & Co.*, supra. There the *claimant's disability arose by reason of an occupational disease contracted on the job.* He was 64 years of age, and the employer refused to reinstate the claimant because if he returned to his regular work his legs would "break out" and he would be forced to quit work again. A finding of 75% permanent partial disability by reason of the occupational disease was supported by substantial and satisfactory evidence and the award affirmed on appeal. There was no evidence the claimant was able to procure, perform and retain work of the same type and character as he was performing at the time he was afflicted.

The facts in the instant case do not fit the situation presented in either the *Knight* or the *Ochoa* cases.

Here the facts are that the claimant suffered contact dermatitis. This is a compensable occupational disease. (K. S. A. 44-5a02.) Dermatitis is defined in K. S. A. 44-5a02 7., as follows:

"7. Dermatitis, that is, inflammation or infection of the skin due to oils, cutting compounds or lubricants, dust, liquids, fumes, gases, vapors, or solids."

The evidence in the instant case supports the finding that the claimant suffered contact dermatitis caused by sanding stainless steel rollers in the factory, after which he suffered temporary total disability for approximately three months, during which period temporary total compensation was paid and medical service provided. The claimant returned to work in the same employment, for the same employer, at the same wages and continued to work for approximately one month without having a recurrence of his dermatitis. Thereafter the claimant stopped working by reason of a lung ailment during which time his contact dermatitis flared up and for which the treating physician continued to treat him until August 1, 1968. Although challenged by the appellants, the evidence is sufficient to support a finding that the claimant suffered temporary total disability from June 3, 1968, to August 1, 1968, attributable to the occupational disease.

The claimant stipulated that at the time of his release on December 6, 1968, the treating physician attending to his contact dermatitis did not rate the claimant as having permanent partial disability as a result thereof, and the examiner's finding adopted by the director and the trial court was that the claimant's permanent disability was attributable to a lung condition—tuberculosis, emphysema and fibrosis—which was not related to his employment.

Under these circumstances an award based on a finding that the claimant has suffered and continues to suffer 50% general bodily disability by reason of disablement for a compensable occupational disease is erroneous.

K. S. A. 44-5a04 provides:

"Except as hereinafter otherwise provided in this act 'disablement' means the event of an employee or workman becoming actually incapacitated, partially or totally, *because of an occupational disease, from performing his work in the last occupation* in which injuriously exposed to the hazards of such disease, and 'disability' means the state of being so incapacitated: . . ." (Emphasis added.)

Under the above statute compensation is allowed only if the incapacity is caused by the occupational disease. The statute does not apply when the cause of the incapacity to work is some outside or extraneous disablement.

If the award of 50% permanent partial disability were approved under the theory applied by the lower court, an award would have

to be allowed under similar facts where the claimant suffered an automobile accident outside of his employment. The disablement from tuberculosis and emphysema was found to be the cause of the claimant's incapacity for re-employment, or prevented him from seeking or obtaining other employment. On the facts in this case the occupational disease was not attributable to the cause of his unemployment.

There is no question on the record here presented the occupational disease from which the claimant suffered was such that he would still be employed by the respondent in work similar to that which he had at the time he contracted the disease, and at the same wages.

The judgment of the lower court is affirmed in all respects, except the allowance of 50% permanent partial disability, as to which it is reversed.